RODRIGUEZ O'DONNELL GONZALEZ &
WILLIAMS, P.C. f/k/a RODRIGUEZ
O'DONNELL ROSS,

   Plaintiff,

  v.

YUSEN LOGISTICS (AMERICAS) INC. f/k/a
YUSEN AIR & SEA SERVICE (U.S.A.)
INCORPORATED,

   Defendant.

and

YUSEN LOGISTICS (AMERICAS) INC. f/k/a
YUSEN AIR & SEA SERVICE (U.S.A.)
INCORPORATED,

   Counter-Plaintiff,

  v.

RODRIGUEZ O'DONNELL GONZALEZ &
WILLIAMS, P.C. f/k/a RODRIGUEZ
O'DONNELL ROSS, THOMAS J.
O'DONNELL, R. KEVIN WILLIAMS,
CARLOS RODRIGUEZ, and HENRY
GONZALEZ,

   Counter-Defendants.

No. 15 CV 3030

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff and counter-defendant, Rodriguez O'Donnell Gonzalez & Williams, P.C., and defendant and counter-plaintiff, Yusen Logistics, entered into a contingency fee agreement that governed ROGW's representation of Yusen as a

claimant against settlement funds, which arose from a multidistrict civil antitrust class action. Seven years after signing the agreement, Yusen terminated ROGW. Yusen continued to receive payments from the settlement funds after it fired ROGW, which prompted ROGW to file this action to recover its contingency fee from the later-received payments. Yusen counterclaimed against the firm and its lawyers, Thomas J. O'Donnell, R. Kevin Williams, Carlos Rodriguez, and Henry Gonzalez, seeking disgorgement of the fees it had already paid ROGW on the basis of breach of fiduciary duty. Both parties have filed motions for summary judgment. For the following reasons, ROGW's motion is granted and Yusen's motion is denied.

## I. Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court must view all facts and reasonable inferences in the light most favorable to the non-moving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013). On cross-motions for summary judgment, a court must draw inferences "in favor of the party against whom the motion under

consideration was made." *Hess v. Reg-Ellen Mach. Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005).

## II.  Background

Beginning in 1997 or 1998, ROGW represented Yusen in a host of legal matters ranging from tariff classifications and free trade agreements, to foreign trade zone issues, custom penalty claims, and related regulatory matters. [62] ¶ 1.[1] Yusen had ROGW on retainer from approximately 2003 to 2007 for a fixed fee of $3,000 per month. *Id.* ¶¶ 2, 5; [70] ¶ 10. Pursuant to the retainer agreement, Yusen could request legal assistance from ROGW in customs-related matters[2] each month for a limited number of hours without being billed at ROGW's hourly rate.[3] [62] ¶ 2.

In June or July 2007, Mark Hogan, Yusen's Director in International Operations, and his boss, Tony Kitagawa, spoke with Thomas O'Donnell about ROGW representing Yusen in a multidistrict civil antitrust class action. [70] ¶ 10. At that time, it was widely known within the air cargo industry (of which Yusen

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which refer to the deposition transcript's original page number. The facts are largely taken from Rodriguez's responses to Yusen's Local Rule 56.1 statements, [62], and Rodriguez's responses to Yusen's Local Rule 56.1 statements, [70], where both the asserted fact and the opposing party's response are set forth in one document. Any arguments raised in the Local Rule 56.1 statements, additional facts included in responses or replies, and statements that are unsupported by admissible evidence (or where a party fails to follow Local Rule 56.1's direction to cite to supporting material in the record) will be disregarded. Only facts that are properly controverted will be considered disputed.

[2] This included customs and international trade law, as well as transportation regulatory law. [62] ¶ 2; [43-2] at 40:6–10.

[3] Thomas O'Donnell, the "O" in ROGW, testified that "whatever the agreement said, the understanding involved was we could devote three hours of time or so to any matter without – and that would fall under the retainer. [. . .] If it was something that was going to be 30 hours, we'd say okay, henceforth it's going to be on an hourly basis, and we're going to open a separate file and bill for it." [43-2] at 42:16–22, 43:4–7.

and ROGW were a part) that the lawsuit existed. *Id.* ¶ 12. The lawsuit involved antitrust violations committed by airline carriers in the air-cargo shipping industry through fee charges; both Hogan and O'Donnell knew that Yusen, as a frequent purchaser of air-cargo shipping services, was a member of the putative class. *Id.* ¶ 11; [43-2] at 47:2–20; [59-2] at 21:2–11. After that conversation, ROGW began representing Yusen in connection with the antitrust litigation.[4] [62] ¶¶ 4–5. Initially, O'Donnell treated his discussions with Yusen in June or July 2007 about the antitrust litigation as covered by the 2003 retainer agreement. *Id.* ¶ 5. A few months later, at a lunch with Hogan and Kitagawa, O'Donnell proposed that ROGW represent Yusen in the antitrust litigation on a twenty-five percent contingency fee basis. *Id.* ¶ 9, 11. O'Donnell, Hogan, and Kitagawa formalized the contingency fee basis of ROGW's representation of Yusen at that lunch meeting in October 2007. [70] ¶ 16. A letter from O'Donnell to Hogan, dated November 2, 2007, constitutes the written contingency fee agreement; from the face of the document, it appears that Hogan executed it on behalf of Yusen on November 3, 2007.[5] [62] ¶ 13; *see also* [43-13].

---

[4] The antitrust litigation is a multidistrict class action that was filed in the U.S. District Court for the Eastern District of New York in 2007. [62] ¶ 3 (citing *In re Air Cargo Shipping Services Antitrust Litigation*, Case No. 1:06-md-01775 (E.D.N.Y.)). On July 13, 2007, class counsel and Lufthansa filed a motion for preliminary approval of an $85,000,000 settlement. *Id.* ¶ 6. On October 26, 2007, the Magistrate Judge in the antitrust litigation issued his report and recommendation that the parties' motion for preliminary approval of the Lufthansa settlement be granted. *Id.* ¶ 8.

[5] O'Donnell says that Hogan executed the contingency fee agreement at the lunch meeting, which occurred in November 2007, [59-1] at 110:2–21, but Hogan says that he executed it after the lunch meeting, [59-2] at 33:7–19, 79:7–12.

Before signing the agreement, Hogan: (i) read and understood it; (ii) discussed it with Kitagawa; (iii) expressly told Kitagawa that he understood it and agreed with its terms; (iv) believed Kitagawa agreed to and understood its terms; and (v) believed its terms were straightforward. [70] ¶ 20; [59-2] at 32:21–33:1, 78:17–79:6, 94:23–95:1, 96:12–21. Kitagawa did not comment on the agreement after the lunch meeting; he simply instructed Hogan to sign it on Yusen's behalf. *Id.* ¶ 18. Hogan did not find Kitagawa's lack of further commentary odd because they had already discussed the details with O'Donnell and he believed that the issues were straightforward.[6] *Id.* When Hogan signed the agreement, he understood that Yusen was agreeing to hire ROGW on a contingency fee basis to process Yusen's refunds from any settlement in the antitrust litigation. *Id.* ¶ 17. He knew about the Lufthansa Settlement Fund, which he did not think would yield much money for Yusen, but he did not know there would be other settlements. [70] ¶ 34. Based on the advice Hogan had received from O'Donnell and the information he had at the time, Hogan thought that it seemed fair to agree to a twenty-five percent contingency fee. [59-2] 42:3–20. Hogan did not believe he was coerced into signing the agreement. [70] ¶ 22. One of the reasons Yusen signed the agreement, from Hogan's perspective, was because Yusen knew that it was not capable of filing

---

[6] The "Scope of Engagement" states: "You are requesting Rodriguez O'Donnell Ross to assist your company in obtaining the maximum possible monetary recovery for damages incurred because of the anticompetitive activities of various airlines in fixing prices for certain fuel surcharges, security charges, U.S. Customs surcharges, and war risk surcharges. This includes filing appearances in the courts having jurisdiction of this matter, handling discovery and objections thereto, filing and responding to motions, filing pleadings, and all other matters necessary to achieve the highest monetary recovery for Yusen Air & Sea Services." [43-13] at 1.

claims in the antitrust litigation on its own; but that if they hired a firm to submit claims on its behalf, it had a chance of getting some money. [59-2] 42:21–43:6.

Shortly after Hogan executed the agreement, Yusen assigned Dale Todaro[7] with primary responsibility for collecting the data ROGW needed to submit claims on Yusen's behalf in the antitrust litigation. [70] ¶ 42; [60] at 12:22–13:20. In 2008, Todaro discussed the contingency fee with O'Donnell and O'Donnell represented that he believed the fee was fair and standard in the industry.[8] [60] 84:15–86:6; *id.* at 82:1–85:6. At the time of that conversation, Todaro did not have (and could not have had) an understanding of how large Yusen's claim would be in the Lufthansa Settlement because the data was not available yet; as such, he relied on O'Donnell's representation. *Id.* at 85:3–86:19. But, Todaro also was aware that Yusen had received hundreds of solicitations, beginning in November 2007, from third parties seeking to submit claims on Yusen's behalf in the antitrust litigation, and Todaro was not aware of any solicitation that offered to perform services on an hourly basis. *Id.* at 183:19–185:7, 188:8–18.

Before filing the first claim for Yusen, ROGW performed many tasks for Yusen. [70] ¶ 44; *see, e.g.*, [62] ¶ 7 (quashing subpoenas); *id.* ¶ 27 (providing forms for Yusen to distribute to its affiliates in other countries so that they could assign their claims to Yusen for the right to represent them in the antitrust action). In relevant part, ROGW engaged in detailed discussions about Yusen's cost-benefit

---

[7] Todaro reported directly to Yusen's President. [70] ¶ 43.

[8] As of September 18, 2008, ROGW had not received data from Yusen to submit the claim form against the Lufthansa Settlement, but ROGW did expect that Yusen's claim would be one of the larger claims submitted. [62] ¶ 24; [43-9] at 110:21–112:23.

analysis regarding its participation in the antitrust litigation. From the start, Yusen was concerned about whether its potential recovery was worth spending the time and effort to submit claims against the settlement fund. Yusen's communications with ROGW show that it was continuously seeking ROGW's advice and carefully considering—if not reevaluating—ROGW's recommendations. For example, in response to questions from Kitagawa on July 11, 2008, Rifkin explained that Yusen could claim against the Lufthansa Settlement not only for air cargo shipping purchases from Lufthansa, but also from other air carriers. [43-15] at 2. Hogan asked, "[A]re any other carriers contributing to this fund? How can Lufthansa settle for other carriers? The $85 million after lawyer fees will not cover much from claims worldwide." *Id.* at 1–2. Rifkin explained the facts, predictions, and risks:

> Lufthansa is not settling for other carriers; the civil litigation against those carriers is still pending. [. . .] There may be additional sources of money available in the future to satisfy claims regarding air freight price fixing defendants other than Lufthansa may settle with the plaintiffs and set up their own funds to satisfy claims and/or the plaintiffs may prevail in the pending litigation and be awarded damages, to be shared with other claimants. At the moment, however, the only source of funds available for claims regarding the alleged air freight price fixing is the Lufthansa Settlement Fund. Therefore, as you correctly point out, the Fund is not going to be sufficient to cover all claims likely to be filed against it. Claimants are instead going to receive proportionate shares; direct claimants will be better off than indirect claimants, as they will have a greater portion of the funds available to them to claim against.[9]

---

[9] Yusen was a direct claimant; its customers were indirect claimants.

*Id.* at 1. Similarly, in a memorandum dated July 31, 2008, ROGW acknowledged a concern that Yusen raised concerning whether the volume of Yusen's shipments was worth the effort of filing a claim against the Lufthansa Settlement. [59-4] at 5. ROGW recommended that Yusen gather initial data to come up with a "rough" dollar amount of its shipment purchases, which ROGW could examine and discuss with Yusen in its upcoming meeting. *Id.* ROGW also outlined the more detailed data it would need from Yusen in order to proceed with filing a claim.[10] *Id.*

After ROGW filed the first claim, and throughout the attorney-client relationship, Jessica Rifkin from ROGW frequently communicated with Yusen's Todaro about the status of Yusen's claims, requests for supporting data, updates from the claims administrator and class counsel regarding the settlement funds, and any predictions or risks of which ROGW was aware.[11] *See, e.g.*, [44-22], [44-23], [44-24]. For example, when a second settlement was in its preliminary stages, Rifkin emailed Yusen on July 15, 2010, to request that Yusen continue to preserve

---

[10] *See also* ROGW's September 15, 2008 memorandum confirming that it had considered Yusen's proposal to file claims, but to not affirmatively notify Yusen's customers of the settlement, and to only comply with customers' requests if they ask Yusen for help with filing claims or for a share of the funds Yusen ultimately receives. [59-4] at 9. The memorandum explains ROGW's assessment of Yusen's potential liability under this proposed approach and confirms that ROGW is "comfortable with proceeding as [Yusen has] suggested." *Id.* Notably, the memorandum also stated: "[W]e estimate that the Lufthansa Indirect Purchasers Settlement Fund has about $16 million [. . .]. The amount of any such refunds to Yusen's customers is unknown at this time, but [. . .], the amount of any refund to a particular shipper probably would be quite small." *Id.* at 10.

[11] Despite these communications, Rifkin did not tell Todaro that ROGW was sending to other clients, who were also claimants, the same notifications about the ongoing status of the antitrust litigation. [62] ¶ 61. Nor did Rifkin tell Todaro that the documentation the class administrator required of Yusen was the same as it required of Rifkin's and ROGW's other client (another claimant). *Id.* ¶ 34. But, the parties dispute whether Yusen knew that ROGW represented other claimants in the antitrust class action. *Compare id.* at 36 ¶ 3 *with* [43-5] at 31:6–32:13.

data and relevant documents for claiming against the Lufthansa Settlement because "[ROGW] believe[s] that these data and documents will be substantially the same as those which will be needed to file a claim against the [Settlement 2] Fund." [43-20] at 1. When eight other airlines established their own settlement fund worth $193.43 million, Rifkin emailed Todaro and others on March 31, 2011, to notify them of that fact and that ROGW would send a memorandum describing the requirements for filing claims against Settlement 2 by the deadline of July 26, 2011. [43-26] at 1–2. Finally, when Settlement 3's notice made it "explicitly clear that if you have already filed a claim against [. . .] Settlement 2, you need not file another claim against [. . .] Settlement 3 to recover from this fund," Rifkin emailed Todaro on March 20, 2012, to inform Yusen of that fact and that the claims administrator "will use the data that you have already provided in connection with [. . .] Settlement 2 to calculate your recovery from [. . .] Settlement 3."[12] [44-9] at 1–2.

ROGW made clear to Yusen that when ROGW was assessing a risk or stating a prediction, that information was not guaranteed to happen; it was uncertain. For example, on January 11, 2013, Rifkin emailed Todaro stating: "While it is impossible to predict the amount which Yusen will receive from Air Cargo Settlement 3 with any certainty at this time, we believe that Yusen's recovery from Air Cargo Settlement 3 is likely to be at least equal to, if not greater than its

---

[12] From this email, Todaro understood that no further substantive work would need to be done by Yusen or by ROGW for Settlement 3. [70] ¶ 65; [60] at 204:22–205:16. He informed Yusen's president and Executive Vice President that they would not need to do "so much work anymore."[12] [60] at 207:14–208:14. In fact, ROGW did not submit a claim on behalf of Yusen against Settlement 3. [62] ¶ 46.

recovery from Air Cargo Settlement 2." [44-11] at 1.[13] Significantly, ROGW also described to Yusen what factors it was basing its conclusions on so that Yusen was able to consider the same and decide for themselves. For example, on July 21, 2011, O'Donnell informed Todaro that ROGW believed that Yusen's recovery against Settlement 2 and any subsequent settlement funds "could be substantially higher, given the fact that at the present time the amount to be distributed in [. . .] Settlement 2 is approximately three times that of the Lufthansa Settlement Fund, and that (unlike the Lufthansa Settlement Fund) indirect purchasers may not claim against [. . .] Settlement 2 and other subsequent funds." [43-31] at 1.

When Yusen raised an issue, ROGW responded with analysis and action. On December 2, 2011, Todaro raised the issue that Yusen had not notified the court about its ownership interest in an affiliate of one of the antitrust litigation defendants, which could make Yusen ineligible to receive settlement funds. [44-1] at 1. Before Yusen had reached a final decision to abandon the antitrust litigation effort, it gave ROGW permission to look into the affiliate issue.[14] [59-1] at 33:4–34:7. With ROGW's help, Yusen returned the initial payment it had received from the Lufthansa Settlement to the claims administrator pending resolution of the affiliate issue. [70] ¶ 62. On March 16, 2012, ROGW sent a letter to the claims administrator in the antitrust class action, representing that Yusen was not an affiliate of one of the defendants in that action, and arguing that Yusen should not be barred from

[13] Todaro forwarded that message to "President Ishizukasan" and highlighted the quoted language above. [44-11] at 1.

[14] Yusen disputes that it was going to abandon the antitrust litigation effort.

recovering from the Lufthansa Settlement. [62] ¶ 41; [44-4] at 1–9. In the alternative, if the claims administrator found that Yusen was an affiliate, ROGW noted that Yusen was only an "affiliate" for part of the class period and should be able to participate on a pro rata basis for the time period when it was not an "affiliate" of one of the defendants. [44-4] at 6 n.1. ROGW did not cite any authority to support its argument (and when Rifkin was asked if she was aware of any supporting authority at the time, she said "I don't think so. I don't remember at this point."). *Id.*; [43-9] at 176:20–177:14. Ultimately, the claims administrator concluded that Yusen qualified as a class member before the acquisition date, but was excluded from the class definition as an affiliate of a defendant after the acquisition date, and it cited the *In Re Records and Tapes Antitrust Litigation* case for support.[15] *Id.* ¶ 42; [43-3] at 21:1–11. Pursuant to class counsel's recommendation to file amended claims consistent with the March 16, 2012 letter, ROGW filed amended claims on behalf of Yusen for the Lufthansa Settlement and for Settlement 2. [62] ¶¶ 43–44.

By October 2014, Yusen knew that Settlement 4 had been approved. [70] ¶ 77. Around the same time, Yusen requested to proceed with ROGW's services on an hourly basis instead of on a contingency fee basis in that action; but, ROGW rejected that request. [62] ¶ 52. Upon advice from Tom Lewis, Yusen's in-house

---

[15] Class counsel identified the *In Re Records and Tapes Antitrust Litigation* case for the court; ROGW never brought that case to class counsel's attention at any time. [43-3] at 21:17–22, 22:11–16. Rifkin believed that the only reason Yusen recovered monies from the settlement funds was because of the letter that ROGW submitted on Yusen's behalf, which convinced the claims administrator that Yusen should not be excluded from being a class member for most of the class period. [70] ¶ 61; [59-5] at 58:6–16.

counsel, Yusen terminated the contingency fee agreement with ROGW on October 13, 2014. [70] ¶¶ 70, 73; [60] at 147:12–20.

On or before December 30, 2014, Yusen hired the firm Baker & Hosteller LLP to file a claim on its behalf against Settlement 4. [44-14] at 3. Approximately one year later, Baker submitted that claim; it contained data that Yusen had not previously submitted in its claim against Settlement 2.[16] [62] ¶ 54. Yusen received $1,314,886.79 for Settlement 4 in May 2016. *Id.* ¶ 55. Settlement 5, which is worth approximately $387.5 million, has been approved, but the amounts that Yusen and other claimants will be paid have not been determined yet. *Id.* ¶ 56.

Yusen received the following from the antitrust litigation: (1) $287,057.83 from the Lufthansa Settlement; (2) $785,153.40 from Settlement 2, plus an additional $66,318.75 in a subsequent distribution in Settlement 2; (3) $776,605.70 from Settlement 3; (4) $1,314,886.79 from Settlement 4; and (5) $1,606,043.30 from supplemental funds in Settlements 2, 3, and 4 since filing this action. [62] ¶ 55; [70] ¶¶ 32–33. To date, Yusen has paid ROGW approximately $478,783.90 pursuant to the contingency fee agreement.[17] [62] ¶ 62. But, Yusen has not made any additional payments to ROGW since Yusen terminated the contingency fee agreement in October 2014. [70] ¶ 94.

---

[16] A paralegal at Baker collected data from Yusen and prepared an amended claim form, schedules, and correspondence to the claims administrator for the submission of that amended claim form. [62] ¶ 54. Baker Hostetler billed Yusen a total of $6,356.25 for its work on that amended claim. *Id.*

[17] Contemporaneously, Yusen approved the payment of ROGW's contingency fee with regards to the Lufthansa Settlement, Settlement 2, and Settlement 3. [70] ¶ 56.

## III.    Analysis

### A.    Timeliness of Yusen's Counterclaim

Yusen's counterclaim alleges that ROGW breached its fiduciary duty to Yusen by collecting an excessive fee. Yusen's theory of the case is that the contingency fee agreement described a broad range of legal tasks that ROGW would perform for Yusen in the antitrust litigation, but that ROGW only performed perfunctory work to submit claims against the settlement funds, and that as a result, taking twenty-five percent of the moneys Yusen recovered is excessive.

A plaintiff must bring an action against an attorney that arises out of an act or omission in the performance of professional services within two years from the time the plaintiff knew or reasonably should have known of the injury. 735 ILCS 5/13-214.3(b). According to ROGW, Yusen should have known of its injuries from the alleged minimal work ROGW performed by March 2012, when the claims administrator determined it would use data from Settlement 2 to determine the remaining claims in Settlements 3, 4, and 5. Since Yusen did not file its counterclaim by March 2014, ROGW concludes that § 214.3(b) bars Yusen's breach of fiduciary duty counterclaim.[18] Yusen does not dispute that § 214.3(b) applies, but instead argues that ROGW has not come forward with evidence that would support an accrual date for Yusen's counterclaim that would render it time-barred as a matter of law. Yusen says it could not have known whether ROGW breached its

---

[18] At the motion to dismiss stage, ROGW offered February 2009 as the date by which Yusen should have realized its injuries because that is when the claims to the first settlement were due. *See* [18] at 11; *Rodriguez O'Donnell Gonzalez & Williams, P.C. v. Yusen Logistics (Americas) Inc.*, No. 15 CV 3030, 2016 WL 427570, at *8 n.11 (N.D. Ill. Feb. 4, 2016).

duty not to collect a reasonable fee until after Yusen paid ROGW for Settlement 3 in October 2013, because that is when Yusen was able to assess the total amount of its recovery versus the nature and total amount of work performed by ROGW.

A cause of action accrues when the facts that authorize bringing the cause of action exist. *Henderson Square Condo. Ass'n v. LAB Townhomes, LLC*, 399 Ill.Dec. 387, 402, *opinion modified on denial of reh'g* (Jan. 28, 2016). Based on the undisputed record, Yusen had knowledge of facts that support its theory by March 2012. First, Yusen knew that it would have to pay ROGW twenty-five percent of its recovery in the antitrust litigation as early as November 3, 2007, when it executed the contingency fee agreement. Yusen reaffirmed the contingency fee agreement at least twice during its attorney-client relationship with ROGW. *See* [70] ¶ 52; [43-26] at 1.

Second, Yusen knew what tasks ROGW was and was not performing in submitting claims against the settlement funds, and Yusen knew what work it was doing *itself*, in furtherance of submitting a claim, as of March 20, 2012. By that time, ROGW had already submitted claims for Yusen against two funds, which involved ROGW and Yusen monitoring each other's progress as well as providing each other updates. In a series of emails on June 7 and 8, 2011, about Yusen's status in collecting data for ROGW for Settlement 2, Todaro expressed confusion—Todaro thought that O'Donnell already had the information ROGW needed to file a claim against Settlement 2, [43-28] at 2–3; and Todaro was simultaneously unsure of how ROGW could have had enough data, because Yusen had only given ROGW

data for one airline. *Id.* at 2. This suggests that Yusen was content to have ROGW submit a new claim on its behalf based on previously collected data for one airline, even though it knew that more data existed. Ultimately, it was not until Settlement 3 that previously collected and submitted data would be used to the exclusion of all new data. To file a claim on Yusen's behalf against Settlement 2, ROGW needed additional data from Yusen beyond what Yusen had already provided to claim against the Lufthansa Settlement. *See id.* at 1–2.

ROGW's email in response to Todaro stated, in relevant part, "While I wish that we could simply use the data that Yusen has already provided to us and prepare Yusen's claim against [. . .] Settlement 2, unfortunately, it is impossible for us to do so. Therefore, we will need data from Yusen to file this next claim." *Id.* at 1. The message also described the format that Yusen should use to submit data for Settlement 2. *Id.* at 1–2. Yusen clearly understood ROGW's directive because Yusen's IT department went on to collect additional data, which Todaro later forwarded to Rifkin, thereby allowing ROGW to submit a claim on Yusen's behalf for Settlement 2. [62] ¶ 38. Moreover, on March 20, 2012, ROGW informed Yusen that the data they had used to file a claim against Settlement 2 would be used in Settlement 3, such that no further work would need to be done in order for Yusen to recover from Settlement 3. There is nothing in the record that shows Yusen objecting to that strategy.

Finally, Yusen argues that its counterclaim is not barred under 735 ILCS 5/13-207. Section 13-207 saves counterclaims from being time-barred if the primary

cause of action, to which the counterclaim responds, commences before the counterclaim would have become time-barred. *Barragan v. Casco Design Corp.*, 216 Ill.2d 435, 449 n.4 (2005) (citing 735 ILCS 5/13-207). In this case, Yusen's counterclaim became time-barred as of March 20, 2014, which was before ROGW filed its complaint (the primary cause of action) in DuPage County on March 6, 2015, *see* [1-1] at 2; thus, § 13-207 cannot save Yusen's counterclaim.[19] The counterclaim is barred by the statute of limitations. The parties have fully briefed the merits of the counterclaim, and I address them in the interests of completeness.

## B.     Breach of Fiduciary Duty

### 1.     *Presumption of Undue Influence*

Yusen argues that the presumption of undue influence applies since it had ROGW on retainer for almost a decade before it signed the contingency fee agreement. When a previously retained attorney enters into a transaction with a client, it is presumed that the attorney exercised undue influence. *In re Marriage of Pagano*, 154 Ill.2d 174, 185 (1992). The attorney can rebut that presumption by a showing of clear and convincing evidence. *Id.* A variety of factors help a court determine whether the attorney has overcome that presumption, including whether: (1) the attorney fully disclosed all relevant information, (2) the client's agreement was based on adequate consideration, (3) the client had independent advice before

---

[19] I do not reach ROGW's argument that under Illinois law, a rebuttable presumption arises that a party waives any claim of undue influence or of fraud in the inducement of an agreement when it accepts the benefits of the contract for three years. *See Maksym v. Loesch*, 937 F.2d 1237, 1244–45 (7th Cir. 1991). In any event, as Yusen asserts, reliance on this authority is inapposite; Yusen's counterclaim alleges a breach of fiduciary duty, not undue influence or fraudulent inducement.

completing the transaction, and (4) the client had a full understanding of all the acts and their legal importance. *Id.* at 186.

ROGW points to evidence in the undisputed record that Yusen and ROGW met and discussed the terms of their relationship before signing the contingency fee agreement. Specifically, Hogan read and understood the agreement before he signed it, and he discussed it with Kitagawa, who Hogan believed understood it as well. Hogan also said that he did not feel coerced into signing the agreement, and that based on the information he had at the time, he thought the agreement was fair. But, Yusen argues that the agreement was not the product of informed consent because ROGW knowingly misstated the scope of its engagement in the agreement and failed to advise Yusen of this fact. To support this argument, Yusen notes that ROGW only filed one document in the antitrust litigation, an Appearance; it otherwise performed administrative work, which it was simultaneously performing for other clients, and it did nothing to secure the actual settlements.

Evidence of what work ROGW performed *ex post* is not decisive evidence of what work ROGW was agreeing to do or what work ROGW believed it would do *ex ante*. The record does not support a finding that ROGW knew it would not handle any discovery matters or file any pleadings in the antitrust litigation. There is no evidence in the record that ROGW knowingly misstated the work it would perform for Yusen in the agreement or that it intentionally failed to disclose facts about the scope of engagement to Yusen. To the contrary, the record shows significant uncertainty as to how the antitrust litigation would unfold and as to what work

would be required—how many settlement funds there would be, how many claimants, what type of claimants, how claims would be submitted, how claims would be supported, how great the recovery, and the like. Amidst this uncertainty, the record shows that Yusen and ROGW discussed how to proceed in their attorney-client relationship with respect to this litigation.

From there, the record shows ROGW working alongside Yusen to cull the necessary data, ROGW reviewing the data and submitting it along with the claim forms, ROGW communicating with Yusen frequently and providing updates, ROGW communicating with class counsel about requirements and procedures, ROGW assessing Yusen's potential liability for choosing to not affirmatively inform its customers about their claims against the settlement funds, and ROGW strategizing with Yusen about whether to proceed with the antitrust litigation in the face of the affiliate issue. While not all of those acts fall within the scope of traditional litigation tasks, they do fall under the agreement's broader category of "all other matters necessary to achieve the highest monetary recovery for Yusen." *See* [43-13] at 1. Some of those tasks were administrative and some involved work that ROGW simultaneously performed for Yusen and for other clients, but other tasks entailed legal analysis or strategy that was specific to Yusen.

ROGW did not advise Yusen to review the contingency fee agreement with independent counsel, but Yusen received hundreds of solicitations from other firms to represent Yusen on a contingency fee basis in submitting claims against the settlement funds, which gave Yusen some indication that it had options beyond

ROGW in pursuing its legal rights in the antitrust litigation. The absence of evidence of independent counsel, compared to the evidence that Yusen considered the agreement before signing it and that Yusen reportedly understood it before signing it, is not enough to warrant the presumption here. ROGW provided clear and convincing (and, most importantly at summary judgment, undisputed) evidence that Yusen was not unduly influenced when it signed the contingency fee agreement.

### 2.  Collection of an Excessive Fee

Yusen maintains that ROGW breached its fiduciary duty to not collect an excessive fee. The reasonableness of a contingency fee agreement is always subject to court supervision. *In re Teichner*, 104 Ill.2d 150, 161 (1984). In other words, a contingency fee agreement may be valid upon formation, but a court may later deem it invalid pursuant to the court's duty to prevent the collection of an excessive fee. *In re Doyle*, 144 Ill.2d 451, 463 (1991). The attorney bears the burden of proving that his fee is reasonable; and courts construe contingency fee agreements against the drafting attorney. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

One measure of a contingency fee agreement's reasonableness is how it compares to the prevailing market rate. *Goesel v. Boley Int'l (H.K.) Ltd.*, 806 F.3d 414, 420 (7th Cir. 2015) (applying Illinois law). "[T]his inquiry can take the form of a side-by-side comparison between the fee ultimately recovered and the lodestar." *Id.* The "lodestar" represents the reasonable number of hours expended on the litigation, multiplied by a reasonable hourly rate. *Id.* A second measure of a

contingency fee agreement's reasonableness takes into consideration the factors outlined in the Illinois prohibition on unreasonable fees, Illinois Rule of Professional Conduct 1.5(a):

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent."

*See* Ill. R. Prof. Conduct R. 1.5(a).

ROGW's position is that the lodestar has no application in this case because "[t]o allow otherwise would forever moot an attorney's right to enforce a contingency fee agreement that, like here, [. . .] resulted in million dollars [sic] of recovery and savings to the client."[20] *See* [66] at 10. This argument is unfounded; the lodestar is one data point that courts consider in determining the reasonableness of an attorney's fee. *See Goesel*, 806 F.3d at 420. Yusen argues that ROGW cannot establish the reasonableness of its fees through the lodestar method because ROGW included inflated and improper entries in its bills for work it performed for Yusen and for other clients. Additionally, Yusen asserts that comparing the contingency fee to the product of hours worked by ROGW lawyers and those lawyers' hourly

---

[20] ROGW also argues that Yusen waived its argument concerning the lodestar method because it did not affirmatively raise it; but ROGW cites no authority for this proposition.

rates yields a contingency fee that would reflect a high multiple (between 1.8 and 4.7) of ROGW's regular hourly rates. *See* [42] at 10; [62] ¶¶ 57–58.

There are several issues concerning the accuracy of Yusen's "multiple" calculation. First, Yusen represented that it based its calculation on a report that one of ROGW's attorneys, Robert Williams, generated in May 2015 using ROGW's historical billing records. [62] ¶ 57. Second, the report calculated a "realization rate" for all of the work ROGW performed for Yusen in the antitrust litigation of $341,652.80. *Id.* Williams explained that the "realization rate" was the quotient of the amount ROGW collected and the hours an attorney worked. [43-7] at 17:5–11 ("So if someone's standard billing rate was – say it's a contingent matter. Standard billing rate was $300 an hour. They had worked one hour on the matter but collected $600. The system would generate $600 as their rate. Simply just collected monies divided by the hours."). Third, Yusen calculated three different contingency fee multiples—(1) using the report's total "realization rate" ($341,652.80) yields a 1.8 multiple over ROGW's regular hourly rates; (2) using all of the fees that ROGW already recovered from Yusen ($478,783.90) yields a 2.5 multiple over ROGW's regular hourly rates; and (3) combining all of the fees ROGW has already recovered with all other payments Yusen has received to date ($953,083.85) yields a 4.7 multiple over ROGW's regular hourly rate—but, Yusen does not explain how it calculated ROGW's regular hourly rate. [62] ¶ 58.

ROGW takes issue with Yusen's reliance on the data from Williams's report; ROGW argues that its attorneys did not record the time they worked for Yusen in

the antitrust action "meticulously" because they knew they were operating under a contingency fee agreement, which meant they were not charging the client by the hour. *See id.* ¶ 57. Yet, ROGW does not offer an alternative approach to calculating the lodestar; it simply points to evidence in the undisputed record that Yusen received hundreds of solicitations from firms to submit claims on Yusen's behalf in the antitrust litigation on a contingency fee basis. Those solicitations could serve as evidence of the prevailing market rate in the air cargo industry, but details of those contingency fee rates are not in the record.

In any event, accepting Yusen's calculation that ROGW's requested contingency fee is a 4.8 multiple over ROGW's regular hourly rate does not lead to the conclusion that that fee is unreasonable as a matter of law. Yusen cites no authority for a rule that a high multiple is necessarily unreasonable, and the context here shows that a contingency percentage is the market rate (so looking simply at the multiple of the lodestar is not a market-based approach to reasonableness). *See*, *e.g.*, *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) ("percentage awards in these cases were consistent with the declarations, proffered by Class counsel, that reported the market rate for ERISA class action attorney's fees is a contingency fee between 25% and 33%"); *Blankenship v. Dialist Int'l Corp.*, 209 Ill.App.3d 920, 927 (1991) (finding the contingency fee contract of 33 ⅓% was "normal" in the relevant community).

For over seven years, ROGW represented Yusen in the antitrust litigation while assuming the risk that it would not be paid in exchange for its work. *See*

*Hensley*, 461 U.S. at 448 ("Attorneys who take cases on contingency, thus deferring payment of their fees until the case has ended and taking upon themselves the risk that they will receive no payment at all, generally receive far more in winning cases than they would if they charged an hourly rate."). The uncertainty of recovery was a real risk here; Yusen's success in the antitrust litigation depended on a number of factors: the number of claimants, eligibility to submit claims, ability to support claims, and the like.

In the antitrust litigation, the court approved fees for class counsel at the following rates: fifteen percent in the Lufthansa Settlement; twenty-five percent in Settlements 2 and 3, except for certain opt-out funds where class counsel were awarded twenty percent; and twenty-two percent in Settlement 4. [62] ¶ 63. Those fee percentages were divided amongst the law firms that served as class counsel. *Id*. Notwithstanding the different types of work performed by ROGW and class counsel, the fact that ROGW's percentage was higher than that of class counsel does not make the contingency fee unreasonable because ROGW drew from a smaller pool of money than did class counsel. In other words, ROGW was only entitled to twenty-five percent of Yusen's recovery, whereas class counsel was entitled to fifteen to twenty-two percent (depending on the fund) of the entire class's recovery. ROGW's percentage was within a reasonable realm of contingency fee arrangements in this type of litigation.

Considering the factors in Rule 1.5(a) has some utility here. The record is silent on many of the factors, but where the parties have marshaled evidence, the

factors demonstrate the reasonableness of the fee arrangement.[21] Yusen received other contingency-fee based solicitations, and this indicates that such arrangements are customary. Although ROGW's seven-year representation of Yusen did not require continuous labor, there were periods of time where ROGW devoted considerable time and attention to pursuing Yusen's recovery against the settlement funds. Yusen attempts to diminish the time and labor ROGW spent by noting that ROGW was able to use some of the work it did for other clients in Yusen's case and that much of ROGW's work was administrative. Yusen has not produced evidence of the amount of work ROGW did for the benefit of multiple clients, and there is no evidence that any efficiency ROGW achieved caused a disproportionate fee to be extracted from Yusen. Moreover, Yusen's characterization of ROGW's work as administrative is undermined by Hogan's admission that Yusen could not have done the work itself, and by evidence in the record that ROGW did more than merely reformat data provided by Yusen into claim forms. The amount involved in the antitrust litigation revealed itself over time to be significant, as was Yusen's recovery. Based on the record, ROGW can take credit for much of that reward. Finally, the fee was contingent, but the record shows that that was the norm for Yusen in the antitrust litigation.

---

[21] ROGW does not believe that Rule 1.5(a) applies to this action because the contingency fee agreement was reached three years before that version of the rule came into effect. As Yusen notes, however, the factors regarding the reasonableness of an attorney fee in Rule 1.5(a) were left unchanged in 2010. *See In re Estate of Sass*, 246 Ill.App.3d 610, 614–15 (1993). Rule 1.5(a) applies to this case.

The crux of Yusen's argument is that to give ROGW twenty-five percent of all the monies Yusen recovered from the antitrust litigation would result in a windfall to ROGW because ROGW bore little risk of non-payment for its work in that action. To support its position, Yusen asserts that: (1) the Lufthansa Settlement had been reached before ROGW filed an Appearance in the antitrust litigation; (2) ROGW believed Yusen's recovery would be substantial; (3) ROGW did no work to procure any settlements; (4) ROGW performed administrative work to submit claims on Yusen's behalf only in the first two settlements; and (5) ROGW overstates its contribution to the resolution of the affiliate issue. The undisputed record, however, tells a different story. It shows that the Magistrate Judge in the antitrust litigation issued a report and recommendation that the parties' motion for preliminary approval of the Lufthansa Settlement be granted before the parties signed the contingency fee agreement; not that the settlement was reached or that all risk of Yusen's recovery had been eliminated by that point. Similarly, the record shows that ROGW informed Yusen that its claim was likely to be one of the largest claims submitted in the Lufthansa Settlement,[22] not that ROGW believed or knew that Yusen would receive a substantial recovery from that settlement or future settlements. Yusen's point that ROGW did not procure settlements is irrelevant; as the record shows, Yusen hired ROGW to help Yusen recover against the settlement

---

[22] Prompted by questions from Kitagawa, Rifkin explained over email: "We expect that Yusen's claim against the [Lufthansa] Fund is likely to [be] one of the larger claims submitted, which will raise the likelihood of an audit. Therefore, it is important that all documentation supporting Yusen's claim is complete and accurate." [43-15] at 2.

fund(s), not to negotiate the settlements themselves; and ROGW delivered on that promise.[23]

The record does not show that ROGW only (or mostly) performed administrative work; it shows that ROGW did work that Yusen could not have done itself, such as consulting with class counsel regarding claim submission requirements and facilitating Yusen's recovery against several settlement funds through submissions of claim forms. That the claims administrator decided to rely on data from Settlement 2 to determine Yusen's recovery for future settlements was not known to ROGW until 2012; thus, the fact that ROGW only had to perform new work in the first two settlement funds in order for Yusen to recover was out of ROGW's control.

Finally, to the same extent that ROGW overstates its contribution to the resolution of the affiliate issue, Yusen understates it. The record shows that Yusen wanted to return the moneys it had recovered from the Lufthansa Settlement and seek the court's guidance in the antitrust litigation. ROGW complied with its client's request by returning the money and seeking the court's guidance. In so doing, and with Yusen's permission, ROGW made the case for Yusen's entitlement to recover from the funds. ROGW raised an alternative argument about Yusen recovering on a pro rata basis; ROGW did not support that argument with a citation to a legal authority. In turn, class counsel provided supportive authority for ROGW's alternative argument and the claims administrator ultimately cited that

---

[23] Yusen knew that ROGW was not class counsel. [43-1] at 94:4–13.

authority in deciding to permit Yusen to recover from the Lufthansa Settlement on a pro rata basis. That decision allowed Yusen to recover from future settlements as well.[24] In other words, without ROGW's alternative argument and the supporting authority class counsel provided, Yusen likely would not have recovered from any of the settlement funds. In sum, ROGW performed work that the claims administrator required to ensure Yusen's recovery from the settlement funds. A twenty-five percent contingency fee for that work is not unreasonable.[25]

### C.    Quantum Meruit

ROGW's quantum meruit claim is based on ROGW's theory that the only reason Yusen is entitled to collect from the settlement funds is because of the work ROGW performed for Yusen in submitting claims for the Lufthansa Settlement and for Settlement 2. [1-1] ¶¶ 45–49. As such, ROGW believes it is entitled to recover twenty-five percent of the amounts Yusen received from the settlements.[26] *See* [58] at 6. Yusen has already paid ROGW approximately $478,783.90, pursuant to the contingency fee agreement; but Yusen has not made any payments to ROGW since Yusen terminated ROGW in October 2014, even though Yusen has received (and will receive) additional payments through Settlements 4 and 5, as well as

---

[24] *See* [59-6] at 18 (Rifkin explaining that Yusen is eligible to claim against Settlements 2 and 3, subject to the same exclusion it faced in the Lufthansa Settlement).

[25] Since I conclude that the fee was not excessive or unreasonable, the statutes of limitations and repose were not tolled, and equitable estoppel does not apply to stop ROGW from asserting a limitations defense. And I do not reach Yusen's arguments about joint and several liability.

[26] Consistent with the basic principles of quantum meruit, I understand ROGW's argument to be that it is entitled to receive twenty-five percent of the amount Yusen received from the settlements, based on ROGW's work, and for which ROGW has not been paid.

supplemental funds in Settlements 2, 3, and 4 since filing this action. Consequently, ROGW seeks twenty-five percent of Yusen's later-received payments.

When a client terminates its attorney and the parties are subject to a contingent fee agreement, the agreement simply becomes void and the contingency term becomes unenforceable. *Will v. Nw. Univ.*, 378 Ill.App.3d 280, 303 (2007). An attorney who provided services on a contingency fee basis, but who the client eventually fires, is entitled to be paid a reasonable fee on a quantum meruit basis for services rendered before the termination. *Id.* at 304. This equitable remedy exists to prevent perverse incentives for clients. Quantum meruit is based on the implied promise of a recipient of services to pay for those services, otherwise the recipient would be unjustly enriched. *Much Shelist Freed Denenberg & Ament, P.C. v. Lison*, 297 Ill.App.3d 375, 379 (1998). An attorney's action for a quantum meruit fee accrues immediately after termination. *Id.*

There are four elements to a quantum meruit claim; the attorney must show that: (1) he performed a service to the benefit of the client; (2) he did not perform that service gratuitously; (3) the client accepted the service; and (4) no contract existed to prescribe payment. *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 402 Ill.App.3d 961, 979 (2010). The attorney bears the burden of proof in establishing the value of his services. *Will*, 378 Ill.App.3d at 304. The trial court has broad discretion to determine a reasonable fee; the court "is not limited to the evidence presented [. . .] but may also use the knowledge it has acquired in the discharge of professional duties to value legal services rendered." *Id.* Trial courts

assess several factors to determine a reasonable fee: the time and labor required, the attorney's skill and standing, the nature of the case, the novelty and difficulty of the subject matter, the attorney's degree of responsibility in managing the case, the usual and customary fee for that type of work, and the benefits to the client. *Id.*

To satisfy the four elements, ROGW first notes that it performed legal services for Yusen for over seven years in the antitrust litigation, which resulted in a benefit for Yusen for over $3.5 million. To prove the remaining elements—that such services were not gratuitous, that Yusen accepted them, and that no contract exists regarding payment—ROGW points to the contingency fee agreement that Yusen executed in 2007 and terminated in 2014. Nevertheless, Yusen argues that ROGW cannot recover on a quantum meruit basis because ROGW cannot establish that its fee was reasonable. Yusen also re-iterates many of its arguments from the breach of fiduciary duty issue, discrediting the work ROGW did under the contingency fee agreement. *See, e.g.*, [71-1] at 3 ("Filling in the blanks with names and numbers on claim forms that were supplied by a court was perfunctory work that for the most part was not dependent on the skills of a lawyer.").

ROGW retorts that it did much more than fill in the blanks with data provided by Yusen. By analogizing to the process of filing tax forms, ROGW insists that the work it performed leading up to the submissions is what allowed Yusen to recover against the settlement funds in the first instance. Moreover, the work class counsel did to procure settlements may have allowed Yusen to submit claims against the settlement funds, but it is not what facilitated Yusen's actual recovery.

But for ROGW's work up to and including the submissions, Yusen would not have recovered from the settlement funds, even though class counsel had negotiated settlements. The risk of no recovery was real, ROGW contends, when Yusen executed the contingency fee agreement. At that time, ROGW argues and Yusen does not credibly dispute, the class had not been defined (it was unknown whether it would include direct and indirect claimants), the amount of recovery was unknown, and the size of Yusen's claim was unknown. Even after the contingency fee agreement was signed and ROGW was well underway with its representation of Yusen in the antitrust litigation, risk of no recovery reared its head again with the affiliate issue and Yusen's wish to return the funds it had received until that issue was resolved. The undisputed record does not support a finding that ROGW had information from which it could predict that none of those risk factors would bear fruit and that Yusen would recover millions of dollars against the settlement funds based, almost exclusively on, the work ROGW did for the first two settlement funds.[27]

Perhaps the risk was smaller than the ultimate reward in this case, but it does not follow that the twenty-five percent contingency fee is unreasonable here. Instead, the record shows that ROGW took necessary steps to facilitate Yusen's recovery from the Lufthansa Settlement and Settlement 2. Due to the claims administrator's decision that submissions for Settlement 2 would constitute the

---

[27] Even when ROGW filed the first claim in February 2009, O'Donnell understood that the court in the antitrust litigation had approved the settlement and that money had been deposited into a fund, but that other issues remained to be decided, which would affect Yusen's recovery. [59-1] at 89:12–93:13.

basis for recovery in future settlements, ROGW did not have to submit new claims or to perform new work for Settlements 3, 4, or 5. ROGW's work allowed Yusen to recover from the settlements after it fired the firm, the claims administrator decided that the work was sufficient, and the client and firm agreed that a contingency fee was the reasonable method of quantifying the value of the firm's services. *See Will*, 378 Ill.App.3d at 304 ("In those cases where an attorney who has done much work is fired immediately before settlement is reached, these factors involved in determining a reasonable fee 'would justify a finding that the entire contract fee is the reasonable value of services rendered.'") (citation omitted). Yusen does not cite any authority for the proposition that the claims administrator's reliance on and use of the firm's previous work for the client's benefit is grounds for limiting the firm's ability to collect fees or for reevaluating the market-based reasonableness of a contingency fee to which the client consented.[28]

In addition to the above arguments, I also consider the traditional reasonable fee factors, and I note the following. A seven-year representation results in not an insignificant amount of time and labor spent by the attorney on the client's behalf, even when that representation only requires intermittent work. ROGW was not

---

[28] The cases Yusen cites are distinguishable from this case. *See, e.g.*, *In re Estate of Sass*, 246 Ill.App.3d 610 (limiting the attorney's fee award to half the amount provided by the contingency fee agreement where attorneys spent little time working on the case, did not file a lawsuit, lacked special skill or experience, and presented no evidence that they lost business due to working on that case); *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 290 F.Supp.2d 840, 855 (N.D. Ohio 2003) (attorneys knew or should have known, before entering into contingency fee agreements that "the contingency factor was negligible, their effort would not bear a reasonable relationship to the size of their client's recovery, and the fee agreement would work to yield them a windfall"; thus, "their insistence on receiving the full contingent fee amount may well amount to a breach of their fiduciary relationship with their own clients.").

experienced in antitrust law, but it was skilled in customs and international trade law, as well as transportation regulatory law, which provided useful context about the underlying air cargo industry. ROGW was in good enough standing to have maintained Yusen as a client for approximately ten years before the antitrust litigation commenced and to have appeared more attractive to Yusen than the hundreds of other solicitations it received to represent Yusen in the antitrust litigation. ROGW was only responsible for analyzing and submitting Yusen's data, not the entire class's data. At the outset, ROGW helped Yusen decide whether it was worth it to participate in the litigation; advised Yusen on the potential liability Yusen faced if it was not forthright with its customers about its participation in the litigation; informed Yusen about the data collection process; and discussed general strategies with Yusen. Later on, ROGW had to analyze the affiliate issue for Yusen and to advocate for Yusen's entitlement to the funds. Beyond those more involved tasks, managing the case typically involved communicating with Yusen, class counsel, and the claims administrator regarding submission requirements, timelines, updates, as well as deciding what and how to submit on Yusen's behalf. Given the hundreds of solicitations, a contingency fee arrangement is typical here, and Yusen offers no evidence that a twenty-five percent fee is non-standard. Finally, Yusen has benefitted from ROGW's services; it recovered millions of dollars before it fired ROGW, and that same work led to successful claims after the firm was fired. ROGW is entitled to recover from Yusen on a quantum meruit basis.[29]

---

[29] Now that judgment on quantum meruit will be entered, ROGW's alternative claims for unjust enrichment and promissory estoppel should be dismissed.

ROGW's motion for summary judgment on this issue is granted; Yusen's motion for summary judgment on this issue is denied. ROGW is entitled to receive twenty-five percent of any payments Yusen received because of the work the firm performed for Yusen before Yusen terminated it. In this case, that includes settlement funds from Settlements 4 and 5, as well as supplemental funds it received from Settlements 2, 3, and 4.[30]

## IV. Conclusion

ROGW's motion for summary judgment is granted. Yusen's motion for summary judgment is denied.

ENTER:

Manish S. Shah
United States District Judge

Date: September 12, 2017

---

[30] The parties will be given leave to brief the precise calculations necessary to reduce the amount to a final judgment.